Dear Ms. Gonzalez:
You write our office on behalf of the Louisiana Public Service Commission ("PSC") to ask for our legal opinion as to whether the Louisiana Commission for the Deaf ("LCD") has the statutory obligation to provide funding for the telecommunications "dual party relay system" from the Telecommunications for the Deaf Fund ("TDF") pursuant to La.R.S.46:2352(10) and La.R.S. 47:1061 and, if it does, what amount of funding is required. The request was made by the PSC as evidenced by the minutes of its open meeting on September 17 and 18, 2002. You asked for an expedited opinion; however, because the opinion on the question you ask for would greatly impact another independent state agency [here, the Louisiana Department of Social Service ("DSS"), which oversees the LCD], our fairness policy required us to request a formal memorandum from the other agency on the question. We have received that memorandum and now address your question.
A great deal of background and historical information, sometimes complicated by interagency dealings, has accompanied your request and been received from both sides. Much of this information is not really necessary to interpret the statutes properly; however, a certain amount of it is needed for any reader of this opinion to understand what is the topic we are talking about and the peculiar circumstances that surround it.
To borrow some definitions from federal law, we can see that "telecommunications relay services" [or as Louisiana statutes sometimes refer to it, a "dual party relay system" in telecommunications] mean
 "telephone transmission services that provide the ability for an individual who has a hearing impairment or speech impairment to engage in communication by wire or radio with a hearing individual in a manner that is functionally equivalent to the ability of an individual who does not have a hearing impairment or speech impairment to communicate using voice communication services by wire or radio. Such term includes services that enable two-way communication between an individual who uses a TDD or other nonvoice terminal device and an individual who does not use such a device."
47 U.S. Code § 225(a)(3), and a "Telecommunications Device for the Deaf" ("TDD") is "a machine that employs graphic communication in the transmission of coded signals through a wire or radio communication system," 47 U.S. Code § 225(a)(2). Louisiana law refers to the function of a "dual party relay system" as "a communications bridge between members of the deaf and hearing citizenry," La.R.S.46:2352(10)(ii).
It appears that, before 1990, telecommunications common carriers in Louisiana were not required to provide telecommunications relay services. The deaf and hearing impaired community, however, desired to have such services available to them. In the late 1980's, they approached the PSC with a view to obtain such services. The PSC did not order any of the telecommunications common carriers in Louisiana to provide such a service and did not impose a telecommunications fee rate to pay for it. Instead, the PSC encouraged the Louisiana Legislature to enact legislation to provide for such services and to levy a tax to pay for it. See generally the recitations within PSC Order No. U-17656. The legislation put the entire project under the LCD, not the PSC, and telecommunication common carriers in Louisiana were still not required to provide the relay services. See essentially La.R.S. 46:2352(10) [putting the establishment of a dual party relay system and the purchase and distribution of TDD's under the LCD] and La.R.S. 47:1061 [levying a $0.05 tax per month on all business and residence telephone users (local exchange access line users) and dedicating the funds received from the tax to the TDF solely to pay for the program described in La.R.S.46:2352(10)]. Later, in 2001, La.R.S. 47:1061 was amended to allow the use of the funds also to purchase and distribute assistive hearing devices (including explicitly "hearing aids").
According to the DSS memorandum we received, the LCD at first created a relay system by contracting with deaf action centers around the state on a district by district basis. According to the recitations within PSC Order No. U-17656, however, the Telephone Access Program Board ("TAPB") formed by the LCD under the statute (having representatives from the deaf community, the telecommunications industry, the PSC, and the public at large) found the capital requirements of purchasing and distributing TDD equipment and running a dual party relay system to far exceed the telecommunications tax levied by the Legislature. According to the recitations in that PSC order, the TAPB continued to seek the aid of the PSC in securing alternative funding for the dual party relay system needed to provide adequate telecommunications relay services.
In the meantime, and completely separate from the above described Louisiana legislation on the subject, the federal Congress enacted the Americans with Disabilities Act in 1990. That Act suddenly required each telecommunications common carrier, acting alone or through or in concert with other telecommunications common carriers, to provide telecommunications relay services for the deaf and hearing impaired at both the interstate and intrastate level. See 47 U.S. Code § 225. The recitations in PSC Order No. U-17656 explain,
 "States, either acting in concert with or separate from state regulatory commissions, were given the opportunity to develop and fund dual party relay centers to handle intrastate calls. The Federal Communications Commission was assigned the task of coordinating interstate completion of calls. In the event a state should not take the necessary steps to insure intrastate call completion, the FCC is empowered to intervene under the legislation to take all action to achieve this goal."
Accordingly, the telecommunications common carriers in Louisiana were imposed with a new federal obligation to provide the dual party relay services. Thus, sometime after two or so years of the Louisiana legislation, under which the LCD, not the PSC or any Louisiana telecommunications common carrier, was obligated to create a dual party relay system, the PSC undertook the task of helping the telecommunications common carriers in Louisiana (those regulated by the PSC) comply with this new federal law, under which they were obligated to provide the telecommunications relay services. Eventually, the PSC, according to the recitations in its Order No. U-17656A, formally accepted the responsibility for fulfilling the telephone relay provisions of this new federal law, created its own Relay Administration Board ("RAB") to oversee the project, made Requests for Proposals (RFP's), awarded to MCI for three years the contract to operate a single statewide dual party relay system to which all other telecommunications common carriers in Louisiana would access, and, in accordance with the federal law, imposed a rate fee of $0.11 per month on all business and residence telephone consumers (each user of a local access line) to pay for such relay services.
According to the DSS memorandum we received, when the PSC finally established a statewide relay system in compliance with federal law under the PSC's auspices, the LCD decided, under the state statutes, that there was no need for the additional district-by-district relay system that LCD had previously established. LCD then abolished its relay system and voluntarily began to contribute to the PSC relay system through mutually consensual agreements or contracts with PSC. In the beginning, before the $0.11 rate fee of the PSC had an impact on the PSC and RAB relay system, DSS said that LCD contributed some $1 million per annum from the TDF toward the PSC and RAB relay system but that since the PSC and RAB relay system has been operating over the years, LCD has contributed lesser amounts. DSS said that the LCD contribution had dropped to $500,000 and, during one year, LCD had not contributed anything. Now, LCD is willing to contribute to the PSC and RAB relay system but in even lesser amounts. A recent offer from LCD has been $100,000. According to DSS, the LCD has to use the money in the TDF for three purposes — viz., to create a dual party relay system in Louisiana, to purchase and distribute TDD's, and to purchase and distribute assistive hearing devices, including hearing aids. DSS claims it has fulfilled its first purpose: It created its own dual party relay system (which it dismantled as unneeded when the single statewide telecommunications relay system was established by the PSC and its RAB pursuant to federal law), and, since then, it has contributed voluntarily to help fund and create the PSC and RAB telecommunications relay system. DSS now says LCD wants to use more funds in the TDF for the other purposes of purchasing and distributing TDD's and assistive hearing devices, since the PSC and RAB relay system, thanks to the $0.11 per month rate fee, is now well funded and needs fewer funds but does not supply TDD's or assistive hearing devices to the deaf and hearing impaired community.
Indeed, to understand the present controversy, one must realize that there are two funds: (1) The TDF is managed under the auspices of LCD and DSS and is funded by the $0.05 per month telecommunications tax levied by La.R.S. 47:1061. (2) The PSC and RAB $0.11 per month rate fee has brought in funds under the auspices of the PSC and RAB to finance the telecommunications relay system pursuant to federal law. According to legislative documents supplied by PSC in connection with the 2001 amendment to La.R.S. 47:1061, the TDF had accumulated some $6 million dollars and the usage had been approximately $1 million per year. PSC claims that the sole motivation of the Louisiana Legislature in amending La.R.S. 47:1061 to allow for the purchase and distribution of assistive hearing devices is that there was more money accumulated in the TDF than was needed for its other two pre-existing purposes. Be that as it may, the legislation was amended to allow for this additional purpose, and DSS and LCD wish to implement the Legislature's decision to allow expenditures for such additional purpose. On the other hand, the PSC and RAB $0.11 rate fee had also accumulated funds to some $28 million (see
the recitations in PSC Order No. 17656-C), and DSS says that, since the PSC and RAB have so much money accumulated, it cannot fully understand the reasons that they insist on continuing to receive some $500,000 per annum from the TDF. According to PSC Order No. 17656-C, the accumulation of the $28 million should provide sufficient funding to finance the telecommunications relay services for several years. That order ended the $0.11 rate fee per month effective April 1, 2002. However, the order also recited that the financial firm of Merrill, Lynch had been consulted to develop a financial plan to invest the monies wisely and to finance the telecommunications relay services from earnings for several years to come. In the financial plan, nevertheless, reliance was had on the continued receipt of $500,000 per annum from the TDF. That order urged and encouraged the continued contribution of that amount from the TDF by the LCD and DSS. PSC also claims that the contribution is necessary so that RAB will be able to retain its charitable status under the Internal Revenue Code but apparently has never explained fully to DSS (or to us) why such is necessary.
We suppose the purpose of this opinion request is to obtain our legal opinion as to whether the DSS and LCD must continue to pay a substantial amount of the TDF to the PSC and RAB to help fund the telecommunications relay system created by the PSC, its RAB, and the telecommunications common carriers in Louisiana regulated by the PSC, pursuant to federal law in 1990.
La.R.S. 46:2352(10) reads as follows:
"§ 2352. Duties
"The commission [i.e., the LCD] shall:
* * *
 "(10) (a) Establish, administer, and promote a statewide program to provide access to all public telecommunications services by persons who are deaf, deaf-blind, and others such as severely hearing impaired or severely speech impaired. This program shall include but is not limited to:
 "(I) The purchase and distribution of telecommunications devices and related devices for the purposes listed above.
 "(ii) The creation of a dual party relay system to function as a communications bridge between members of the deaf and hearing citizenry.
 "(iii) The creation of a telephone access program board, as provided for in R.S. 46:2355, recommendation for the selection of staff, rate/surcharge, operating budget, and other related matters; determination of functions of the staff, approval of the selection of appropriate equipment, development, evaluation, and modification of the distribution system for specialized equipment, approval of the development, implementation, evaluation, and modification of a year-round, twenty-four hour dual party relay system, and the engagement in other related activities not inconsistent with legal mandates nor otherwise prohibited by law.
 "(b) The commission shall promulgate, pursuant to R.S. 49:950, et seq., such procedures, regulations, rules, and criteria and may also take other action necessary to implement and administer this program where not otherwise prohibited by law."
La.R.S. 47:1061 reads as follows:
"§ 1061. Telecommunication tax for the deaf
 "A. (1) There is hereby levied a tax of five cents per month on each residence and business customer telephone access line of the local exchange companies operating in Louisiana. The tax shall be collected from each residence and business customer and remitted by each such company on or before thirty days after the close of each calendar quarter to the secretary of the Department of Revenue on forms prescribed by the secretary.
 "(2) The local exchange companies collecting and remitting such tax as hereinabove provided shall be allowed a deduction, not to exceed two percent, from the amount so collected and remitted to the secretary as compensation for such collection. The compensation shall not be allowed, however, if the remittance is not made timely.
 "(3) The tax so collected and remitted by the local exchange companies shall not be subject to any tax, fee, or assessment, nor shall it be considered revenue of the local exchange companies.
 "(4) The revenues so collected shall be remitted by the secretary immediately upon receipt to the treasurer and the treasurer shall credit the full amount of such taxes to the Bond Security and Redemption Fund. After a sufficient amount is allocated from that fund to pay all obligations secured by the full faith and credit of the state which become due and payable within any fiscal year, the treasurer shall pay the remainder of such funds into a special fund which is hereby created within the state treasury and designated as the "Telecommunications for the Deaf Fund".
 "B. The monies in the Telecommunications for the Deaf Fund shall be used solely to establish, administer, and promote a statewide program to provide access to all public telecommunications services as provided in R.S. 46:2352(10) and to purchase and distribute assistive hearing devices, including hearing aids, for persons who are deaf, deaf/blind, or others who are similarly handicapped, in the amounts appropriated each year by the legislature to the Louisiana Commission for the Deaf. Any surplus monies remaining to the credit of the fund on June 30 of each year and any funds earned through the investment of the monies in the fund shall remain to the credit of the fund."
Act 13 of the 2002 Regular Session (which began as House Bill No. 1) is the general appropriations act for fiscal year 2002-2003. On pages 183-184 of that act can be found the appropriations dealing with the TDF. It is encompassed in the overall appropriations for "Specialized Rehabilitation Services" in the amount of $67,278,385. The parts pertaining only to the TDF contain no specific sub-allocation but is merely an unspecified part of this overall amount. A description of the services appears on lines 53 through 63 on page 183 of the Act, as follows:
 "Objective: Through the Louisiana Commission for the Deaf, to provide Telecommunication, assistive hearing devices, and outreach activities to 11,144 eligible clients to ensure that Louisiana's public and private services are accessible to deaf, hard-of-hearing and speech impaired citizens.
"Performance Indicators:
Number of clients receiving telecommunications devices 5,216
Number of clients benefiting from outreach activities 5,428
Total number of clients served 11,144
 Percentage of clients rating services as "good or excellent" on customer satisfaction survey 92%
Number of clients receiving assistive hearing devices 500"
The "Means of Financing" these "Specialized Rehabilitation Services" appears on lines 11 through 22 on page 184 of this general appropriations act. Among the "Fees and Self-generated Revenues" with "Statutory Dedications" is the "Telecommunications for the Deaf Fund" (on line 19 of page 184 of the act) in the amount of $2,143,238.
Pursuant to these legislative statutes and legislative appropriations, the funds in the TDF are appropriated each year to the LCD to be used for the three purposes specified therein. Yes, one of those purposes is to create a dual party relay system in Louisiana. But that statutory obligation has been somewhat superseded by federal law, which, some two years after the state statutory provision was enacted, now requires telecommunications common carriers in Louisiana to create and provide such telecommunications relay services. 47 U.S. Code § 225. Moreover, the LDC has continued to offer to contribute some of the funds for the maintenance of the telecommunications relay services established pursuant to federal law, at least recently up to $100,000. But the bottom line is that there are two other purposes which also have to be fulfilled — viz., (1) the purchase and distribution of TDD's and (2) the purchase and distribution of assistive hearing devices. And the Louisiana Legislature, by these statutes and appropriations, has entrusted the LCD with the funds in the TDF and has delegated to the LCD, not to the PSC or its RAB, the executive authority to spend TDF funds for each of the purposes in the budgetary amounts allowed. Thus, we cannot say that the state statutory law requires the LCD to grant to the PSC or its RAB any specific amount of the TDF funds that the PSC decides it would like to have for the PSC's telecommunications relay system that is federally required of telecommunications common carriers (only one purpose), to the detriment of the other two purposes for which the TDF exists. It is the LCD, not the PSC or its RAB, which has the state statutory obligation to use the TDF funds in the best manner for Louisiana citizens within the three purposes of expenditure allowed according to statutory and budgetary directives.
We admit that this whole situation appears to reveal awkward circumstances — viz., the state statutes giving an obligation to establish a telecommunications service to an agency that does not regulate telecommunications common carriers; then, the federal government, by federal law, requiring telecommunications common carriers within the state to provide the same telecommunications service intrastate; and the levying of a $0.05 tax on telephone users to pay for ordinary hearing aids, as well as TDD's and a dual party relay system. Perhaps, the Louisiana Legislature would like to revisit this area and enact new comprehensive legislation to deal with the matter, in light of the federal law on the subject. In the meantime, the PSC can only do what is in its power to provide for the telecommunications relay services required by federal law and can count only on the voluntary participation of the LCD to the extent the LCD deems, in its discretion and according to the restraints of the currently applicable appropriations act, to be the best allocation of TDF funds for the three purposes for which these funds may be spent.
Trusting this opinion has adequately answered your request, we remain
Very truly yours,
 RICHARD P. IEYOUB Attorney General
 By __________________________________ THOMAS S. HALLIGAN Assistant Attorney General
cc: Ms. Gwendolyn Hamilton, Sec'y, DSS
DATE RELEASED: May 15, 2003
 Thomas S. Halligan Assistant Attorney General